1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    DELMON A.,[1]                              Case No.  19-cv-04599-TSH

8                   Plaintiff,

9         v.                                    **ORDER RE: CROSS-MOTIONS FOR
                                                SUMMARY JUDGMENT**
10   ANDREW SAUL,
                                                Re: Dkt. Nos. 18, 19
11                  Defendant.

12

13                              **I.      INTRODUCTION**

14        Plaintiff Delmon A. brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial

15   review of a final decision of Defendant Andrew Saul, Commissioner of Social Security, partially

16   denying his claim for disability benefits.  Pending before the Court are the parties' cross-motions

17   for summary judgment.  ECF Nos. 18 (Pl.'s Mot.), 19 (Def.'s Mot.).  Pursuant to Civil Local Rule

18   16-5, the motions have been submitted without oral argument.  Having reviewed the parties'

19   positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby

20   **GRANTS** Plaintiff's motion, **DENIES** Defendant's cross-motion, and **REMANDS** this case for

21   further proceedings.

22                              **II.     BACKGROUND**

23   **A.     Age, Education and Work Experience**

24        Plaintiff is 54 years old.  AR 282.  He attended special education classes and finished high

25   school through a continuation school.  AR 58-59.  His grades ranged from As to Cs.  AR 308.  He

26

27   _____

28   [1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
     recommendation of the Committee on Court Administration and Case Management of the Judicial
     Conference of the United States.

United States District Court
Northern District of California

worked as a clean up guy at a restaurant for a few years in the 1990s.  AR 87-88.

**B.     Medical Evidence**

Plaintiff reported having been physically abused by both of his parents, including frequent whippings with extension cords, razor straps, and switches until the age of fourteen.  AR 687.  He was seen at the emergency room in 1972 for a foot laceration.  AR 428.  At eight years old, he was treated for a laceration on his scalp and would not tell the doctor how it occurred.  AR 429.  At sixteen years old he was involved in a minibike accident and seen for an open fracture in his leg and a repair of the tendon in his ankle.  AR 435-36.  In 1994 he had part of his big toe amputated while trying to operate a lawnmower.  AR 583.

In 1996 Plaintiff underwent surgery after being hit by a car while riding a bike. He had a left tibial plateau fracture and a right open olecranon fracture.  AR 538, 592-93.  The treating specialist at Stanford Medical Center opined that Plaintiff would have lifelong limitations because of the extensive injuries he sustained, as well as an increased risk of developing arthritis.  AR 596.  He made a good recovery and was able to walk with a normal gait.  *Id.*

On October 7, 2013, Plaintiff saw therapist Chauncey Chatman, MFT, at San Mateo County Behavioral Health ("SMCBH").  AR 655.  He reported hearing voices, experiencing headaches and insomnia, and feeling tired and easily angered.  *Id.*  He also noted experiencing flashbacks to when he was shot, difficulty concentrating, an increased startle response, and overeating.  *Id.*  On November 13, Plaintiff noted experiencing depressive symptoms as well as paranoia and a sense of dread.  AR 656.  He also reported isolating at his mother's home, not eating regularly, having trouble concentrating and sometimes talking to himself.  *Id.*  He reported a history of trauma, symptoms of post-traumatic stress disorder ("PTSD"), and depression.  *Id.*

Plaintiff returned to SMCBH in December 2013, where he was seen by Chapman and counselor Peter Field.  AR 658-59.  He reported having experienced trauma and violence, including frequent childhood abuse from his mother, often feeling depressed, isolating himself and avoiding being around people, and being preoccupied with paranoid thoughts.  AR 659.  Chatman noted his symptoms met the criteria for depression and PTSD and recommended Plaintiff receive medication and case management services to improve his coping skills and daily functioning.  *Id.*

2

United States District Court
Northern District of California

1    On January 13, 2014, Plaintiff saw Nabeela Rahman, M.D., at SMCBH for psychiatric

2    medication support.  AR 661.  Dr. Rahman noted a history of cognitive deficits including poor

3    memory, PTSD, and depression.  *Id.*  Plaintiff reported feeling less anxious with better focus,

4    although still being paranoid about people getting him from behind and unable to tolerate being in

5    stores.  *Id.*  Plaintiff's mental status exam was within normal limits, with good concentration and

6    memory, but Dr. Rahman increased his medication for ongoing anxiety symptoms.  *Id.*

7    On January 14, 2014, Plaintiff reported to therapist Chatman that he experienced decreased

8    auditory hallucinations since starting his medications, but he continued to experience them as well

9    as side effects of nausea and dry mouth.  AR 662.  On January 28 he reported continuing paranoia,

10   nausea, hearing voices, and racing thoughts.  AR 663.  Despite the side effects, he found the

11   medications helpful.  *Id.*  At a therapy session on February 11 Plaintiff reported that he decreased

12   his dosage due to increased side effects, but his auditory hallucinations subsequently increased.

13   AR 664.  He also reported severe issues with his mother, including fighting with her and being

14   asked to move out.  *Id.*

15   On February 24, 2014, Plaintiff had an appointment with Dr. Rahman and reported that the

16   symptoms of his PTSD and auditory hallucinations had worsened and that his mother continued to

17   be abusive.  AR 665.  Dr. Rahman opined that his hallucinations were related to PTSD rather than

18   a thought disorder and switched his medications.  *Id.*  His mental status examination showed good

19   memory and concentration judgment and insight.  *Id.*

20   At a visit at Ravenswood Family Health Center on January 30, 2014, Plaintiff told Edward

21   Kim, M.D., that he was depressed, heard voices, and could not stand having anyone physically

22   behind him.  AR 645.  He was seeking medical treatment because his significant other had noticed

23   him talking to himself and requested that he get help.  *Id.*  Dr. Kim noted that Plaintiff was

24   oriented and with appropriate mood and affect but opined that he may have some psychotic

25   features.  AR 647.  His physical examination did not reveal any significant deficit.  *Id.*  Plaintiff

26   saw Dr. Kim again on February 14, complaining of moderate symptoms of depression that were

27   "fairly" controlled and occasionally hearing voices due to his PTSD.  AR 642.

28   In March 2014 Plaintiff reported to therapist Chatman that he was experiencing side effects

United States District Court
Northern District of California

from his new medications including dry mouth, grinding teeth, nausea, and exhaustion.  AR 667.
He reported continuing to hear voices and having nightmares.  *Id.*  A week later, he felt more
mellow and reported that his sleep was better with fewer nightmares.  *Id.*  He made good eye
contact, his speech was normal, and concentration, memory and cognition, judgement, and insight
were good.  AR 667-68.

Later that month, he reported decreased symptoms with his new medications and that he
had felt good for three days.  AR 669.  He was also working with his case worker, Mary Brown,
and had been able to enter a store without significant anxiety.  *Id.*  On April 8 he reported feeling
"somewhat" better than he had when he first got services but that he continued hearing voices,
albeit quieter ones, and still sometimes "drifts off" in his thoughts but has better focus.  AR 670.
After taking medication for three weeks, his sleep and headaches had improved.  He reported
taking walks, riding his bike, and feeling less anxious in public or around people for the first time
in a long time.  He reported trying to improve his health and get help finding a job.  AR 669.

Plaintiff saw Dr. Rahman again on April 21, 2014, at which time she changed his
medication because of continued side effects.  AR 671.  He reported the medication was helping a
lot with depression and paranoia.  *Id.*  His mental status examination showed normal speech,
euthymic mood memory and concentration, judgment and insight were good.  *Id.*  He believed he
was becoming adjusted to his medications and was referred for employment assistance.  AR 672.

In May 2014 Plaintiff reported to therapist Chatman continued "very disturbing" auditory
hallucinations with ongoing difficulty focusing and concentrating.  AR 673.  He also reported side
effects from the new medication.  *Id.*  On May 20 he presented with increased depressive
symptoms and complained of auditory hallucinations connected to past traumas.  AR 675.  He
accepted a referral to help with finding employment and reported he wanted to work ASAP.  AR
673.  He complained of visual disturbances, but they did not affect his ability to ride his bike, walk
or read.  *Id.*  He stated that he received a letter from the police indicating his phone was being
tapped.  AR 674.  His mental status examination remained the same with no apparent difficulties
in memory, concentration, insight or judgment.  AR 674.  He spoke with his son, which caused his
depressive symptoms to increase, and he expressed interest in applying for SSI.  *Id.*

United States District Court
Northern District of California

1    On June 2, 2014, Dr. Rahman noted that Plaintiff continued having symptoms of anxiety

2    and PTSD despite medications.  AR 676.  Dr. Rahman also noted that the "voices" appeared to be

3    more related to PTSD than true hallucinations.  *Id.*  Dr. Rahman felt Plaintiff's hallucinations were

4    not true auditory hallucinations and his stress stemmed from his son's legal issues and being

5    around family members.  *Id.*  He made good eye contact and his mental state remained within

6    normal limits.  *Id.*  He was scheduled for appointments with the housing authority and vocational

7    rehabilitation services for help securing employment.  AR 677.

8    Later that month, Plaintiff reported to Chatman that he experienced numerous medication

9    side effects.  AR 678.  In July 2014 he reported lessened side effects and that he felt as if he could

10   accomplish some of the objectives towards living independently.  AR 680.  He reported doing well

11   on his new medications, feeling energized and sleeping better.  *Id.*

12   On July 7, 2014, Dr. Rahman added an additional medication to help with his auditory

13   hallucinations.  AR 681.  His symptoms had improved, he made good eye contact, his mental

14   status examination showed good cognition, judgment and insight, but he still heard voices.  *Id.*

15   On July 15, 2014, Plaintiff reported to counselor Field that he felt the voices had changed

16   in quality but were somewhat worse since he was trying to move out of his mother's home with

17   Ms. Brown's assistance.  AR 682.  He received a housing voucher and Ms. Brown said she would

18   help with rent and a deposit until he received SSI and could pay her back.  *Id.*  He was sleeping

19   better, could tolerate small groups of people better but felt stress about being responsible for an

20   apartment.  *Id.*

21   In a therapy meeting on August 4, 2014, Plaintiff noted that he had difficulty reading,

22   remained hypervigilant, and experienced symptoms of PTSD.  AR 703.  At an appointment on

23   August 12, therapist Chatman noted that he had good hygiene and clean clothing and appeared

24   relaxed.  AR 704.  Plaintiff reported that he did not want to follow through with a referral to

25   vocational rehabilitation services because he was afraid it would complicate his disability case.  *Id.*

26   On September 9 Chatman noted that Plaintiff had good eye contact, clear speech, and appropriate

27   dress.  AR 706.  Plaintiff stated he visited an uncle and that the visit went well, but the animals

28   there scared him and caused difficulty sleeping.  *Id.*

United States District Court
Northern District of California

1    After a medication management meeting on September 15, 2014, Dr. Rahman reported that

2    Plaintiff had a normal mental status exam.  AR 707.  Plaintiff noted that he continued to have

3    some PTSD-related nightmares, heard voices occasionally, and experienced occasional symptoms

4    of depression.  *Id.*

5    At a visit with therapist Chatman on September 23, 2014 Plaintiff reported more

6    nightmares, not sleeping well, and not eating well.  AR 708.  He reported that the specialist from

7    vocational rehabilitation told him to continue with his disability application process before

8    obtaining job services from them.  *Id.*  On October 17 Chatman noted that Plaintiff had good eye

9    contact, hygiene, and was engaged and "expansive."  AR 709.  Plaintiff reported continued

10   isolation and difficulty at home and with finding his own housing.  *Id.*  He expressed gratitude for

11   the progress he has made.  *Id.*  He found fault in his mother's behavior and looked forward to

12   finding an apartment on his own.  *Id.*  Speaking with his son by phone made him feel uplifted.  *Id.*

13   On October 31 Plaintiff reported not sleeping well, pacing at night, hearing noises, and feeling

14   "jumpy."  AR 710.

15   Therapist Chatman prepared an assessment on October 1, 2014.  AR 728-32.  He found

16   Plaintiff's functioning was impacted by trauma, an appropriate appearance with sad affect, motor

17   retardation, depressed mood, auditory hallucinations, loose associations, attention issued, slowed

18   speech, memory problems, poor concentration, and poor judgment.  AR 729-30.  He noted that

19   Plaintiff reported increased startle response, hypervigilance, and flashbacks associated with prior

20   trauma.  AR 730.  He reported Plaintiff's stressors included his son's incarceration, his mother's

21   erratic behavior, and his need to find a different place to live.  AR 731.

22   On October 26, 2014, Plaintiff saw Parimal Shah, M.D. for a consultative exam.  AR 694-

23   700. Dr. Shah opined that because of chronic left knee pain, right elbow pain, and stiffness,

24   Plaintiff would experience some limitations including a limit on lifting and carrying more than 20

25   pounds occasionally, 10 pounds frequently, standing and walking up to 6 hours, and handling

26   frequently.  AR 699-70.

27   On December 1, 2014, therapist Chatman noted that Plaintiff presented as depressed and

28   cried during the session, but he had good hygiene and eye contact as well as appropriate dress and

expansive speech.  AR 711.  Plaintiff reported feelings of paranoia, difficulty getting along with family members, and symptoms of depression and PTSD.  *Id.*

On December 17, 2014, Plaintiff met with psychiatrist Nandini Ganpule, M.D. at SMCBH, who noted that he was well groomed, pleasant, and cooperative but was guarded and reported on and off depressed mood.  AR 712-13.  Dr. Ganpule increased his medications to respond to his depression and PTSD symptoms.  AR 712.  Dr. Ganpule reported Plaintiff's symptoms were less intense, and his mental status examination showed him as pleasant, well groomed, with good judgment and insight, cognitive functioning unimpaired, but with off and on depressed mood.  AR 713.

Plaintiff saw therapist Chatman again on January 5, 2015, where he presented as depressed with slow speech and gait but good eye contact and hygiene.  AR 718.  He reported continued sleep problems, depression, and PTSD symptoms.  *Id.*

At a medication management meeting later that month, Dr. Ganpule found Plaintiff had adequate hygiene, pressured speech, anxious, distrustful, and restless mood and affect, paranoid thinking, auditory hallucinations, poor attention and concentration related to hypervigilance, and impaired insight as well as memory.  AR 719.  Plaintiff reported running out of medication and that he did not find his increased medications helpful.  *Id.*  He did not like living with his mother, so he isolated himself and remained stressed about his son.  *Id.*  Dr. Ganpule prescribed a new medication, Abilify, to help with the paranoid thinking and voices.  *Id.*

On February 11, 2015, Plaintiff reported that he was doing better with the new medication and not talking to himself.  AR 721.  Dr. Ganpule noted that his mental status examination was improved, and his prescription for Abilify was increased to try to eliminate the voices.  *Id.*  Plaintiff reported no nightmares and improved sleep.  AR 722.

On February 24, 2015, therapist Chatman noted Plaintiff to be depressed with a slow speech and gait.  AR 724.  Plaintiff reported racing thoughts, difficulty being around others and that he discontinued Abilify after experiencing nose bleeds.  *Id.*  He continued to report sleep and appetite disturbance.  *Id.*  In February, March, and April 2015 Plaintiff presented to Chatman with depression and slow speech.  AR 726, 785, 788-90.

1

At a visit on April 1, 2015, Dr. Ganpule noted that Plaintiff had difficulty understanding his medications and dosages but was doing better.  AR 786-87.  On May 6 Dr. Ganpule found him to be anxious and agitated, with pressured speech and a recent increase of auditory hallucinations.  AR 782-83.

During therapy sessions with Chatman in May, June, and July 2015, Plaintiff had poor or intermittent eye contact, tearfulness, halting and slow speech, and reported continued PTSD symptoms.  AR 775-76, 779, 781.

On June 15, 2015, Dr. Ganpule found that Plaintiff had a moderate degree of ongoing anxiety related to chronic paranoid ideation and persistent auditory hallucinations along with paranoid thinking.  AR 777.  Plaintiff indicated the increased Abilify helped.  *Id.*  His mental status examination showed no cognitive deficits, memory, insight or judgment impairments, despite complaints of auditory hallucinations and paranoid thoughts.  *Id.*  He wanted to continue with Abilify regardless of side effects.  AR 788.

At a medication management meeting on July 15 Plaintiff stated he was "hanging in there" and was unable to tolerate an increase in his Abilify at the time.  AR 773.  He stated he was taking just enough to keep him calm, not depressed or bothered by voices.  *Id.*  His mental status examination showed no gross impairment.  *Id.* He told his therapist he still did not like being around crowds and did not attend a neighborhood block party, but he rides his bike and takes long walks.  AR 775-76.

In August 2015 Plaintiff presented as frustrated and troubled with family relationships, including having engaged in a physical altercation.  AR 768.  He indicated he was relying on Ms. Brown to help him find an apartment and pay his rent, but he needed to complete paperwork for general assistance.  AR 770.  He also reported he had not increased the Abilify dosage as suggested and he complained of problems at home.  *Id.*  His mental status examination remained within normal limits without major impairment.  AR 768.

On August 27, 2015, Plaintiff reported to therapist Chatman that the increased medication made him feel "spacey" and "zoned out."  AR 767.  During this therapy session he became despondent and appeared slightly agitated.  *Id.*  At a therapy session on September 20 Plaintiff

8

noted that even being around children could trigger his PTSD symptoms. AR 764. He also revealed his experience of abuse perpetrated by a male relative. *Id.* During a visit on October 28, Chatman observed that Plaintiff had a depressed presentation with poor eye contact, and "expansive" and pressured speech. AR 758. He was tearful and admitted to intensified feelings of paranoia and auditory hallucinations. *Id.* On September 2 he noted feeling more relaxed because of his medication increase, but he continued to hear voices, felt "very leery" of other people, and continued to experience PTSD symptoms of not wanting anyone behind him. AR 765. He stopped taking Effexor, the hallucinations were diminished, and he found he was not so angry all the time. *Id.* His mental status examination showed no major impairment in concentration, memory, judgment or insight. *Id.*

On October 5, 2015, therapist Chatman prepared an updated assessment. AR 761-63. He found that Plaintiff had a depressed mood; angry, sad, and anxious affect; slowed speech; memory problems; impulse control; poor concentration and judgment; tremors and an unusual gait; and flights of ideas, loose associations, and poor insight along with reported symptoms of PTSD. AR 762. Plaintiff reported fewer side-effects from medication, was meeting with his counselor, and he was spending less time at home to reduce household tension. *Id.* Chatman found that treatment was needed to address or prevent significant deterioration in his social relationships, daily living skills, and symptoms management. *Id.*

On October 7, 2015, Dr. Ganpule increased Plaintiff's medication dosage, which appeared to be helpful in managing his auditory hallucinations. AR 759-60. Plaintiff continued having side effects with the increased dosage. AR 755. He appeared depressed, made poor eye contact, and claimed family members were unsupportive, which increased his sense of paranoia, depression and nightmares. *Id.* However, he reported feeling more relaxed, calm and quiet, and did not want to change medication. His mental status examination did not reveal any signs of marked impairments. AR 759.

During visits in November and December 2015 therapist Chatman noted that Plaintiff appeared to be depressed. AR 753-54, 757. His eye contact, appearance and orientation were within normal limits, he reported not always taking his medication but taking the increased dosage

of Abilify reduced his auditory hallucinations to a whisper, and he slept better with increased

dosage of Trazodone.  AR 753-55, 757.  His mental status examination showed normal

concentration, memory, judgment and insight, and he claimed his medications were "really

helping."  AR 755.

Dr. Ganpule saw Plaintiff on December 30, 2015, for medication management, and he was

noted to be doing well since he was alone in his house.  AR 751.  Plaintiff reported he was happy

with his medication regimen, which seemed to help him a lot.  *Id.*  His memory and concentration

were grossly normal.  *Id.*

On February 25, 2016, Neuropsychologist Paula Chaffee, Ph.D. performed an evaluation

on behalf of the San Mateo County Department of Social Services to assess him for mental health

and/or cognitive disability.  AR 734-43.  Dr. Chaffee reviewed Plaintiff's mental health records

and conducted her own testing and evaluation.  She reported a history of Plaintiff's mental health

conditions and symptoms, as well as daily activities consisting of taking care of his hygiene,

watching television, fixing simple microwave meals, doing his own laundry, taking a bus, and

self-administering his medications.  AR 734-36.  Plaintiff reported that he spent his days in his

room or backyard with his dog.  AR 736.

Dr. Chaffee reported anxious mood with affect congruent, significant motor agitation,

paranoid delusions, endorsed auditory hallucinations, impaired insight, and poor judgment, with

all other findings within normal limits.  AR 737-38.  On testing, Dr. Chaffee found Plaintiff had

extremely low nonverbal intelligence, processing speed, attention and delayed memory, reading,

spelling and math. He also had borderline scores in working memory, immediate memory, and

visuospatial/construction and Part B of the Trail Making Test (testing divided attention, motor

speed and mental flexibility).  AR 737-39.  Dr. Chaffee opined that he exhibited signs and

symptoms of PTSD and depression.  AR 740.

Dr. Chaffee found Plaintiff to be in the borderline range in his ability to sustain attention,

concentration, and exert mental control.  AR 739.  Although he tested in the extremely low

category, she felt that his true IQ was likely in the borderline range based on an informal

assessment of his adaptive functioning.  AR 739-40.  She found Plaintiff had difficulty learning

new material and had a higher than average rate of forgetting.  AR 740.  Dr. Chaffee found his attention was poor and he had difficulty learning and retaining information.  AR 742.  She also found he had difficulty with executive functions and would have difficulty "being around people, . . . recalling complex instructions, maintaining adequate work pace, sustained attention and concentration and especially will have difficulty withstanding stress."  *Id.*

Dr. Chaffee opined that Plaintiff would have marked impairments in following/remembering complex or detailed instructions, maintaining pace or persistence with complex tasks, sustaining adequate attention/concentration with any work-related tasks, withstanding the routine stress of a workday, and interacting appropriately with coworkers and the public.  *Id.*  She found moderate limitations in his ability to maintain pace/persistence with even one or two step repetitive tasks, emotional stability/predictability, and regular attendance.  *Id.*  Additionally, she found him moderately limited in adapting to changes and performing work activities without special supervision.  *Id.*  She opined that his prognosis was poor and that he needed someone to help him manage any benefits.  *Id.*  However, she opined Plaintiff had no impairment performing simple tasks, communicating effectively, accepting instructions from supervisors, or performing activities of daily living.  *Id.*

At his therapy sessions with Chatman on January 4 and 20, 2016, Plaintiff presented with depression.  AR 749-50.

Dr. Ganpule saw Plaintiff on February 1, 2016 and noted that "the benefit he obtains from the medication far outweighs the side effect despite having developed tardive dyskinesia.  He cannot see himself function without it."  AR 747.  The exam was otherwise normal.  *Id.*  He had no complaints and reported that he tolerated his medication's side effects because he could not function without it.  *Id.*  His concentration and memory were unimpaired.  *Id.*

Plaintiff saw therapist Chatman on February 3, 2016 and presented as depressed and agitated with poor concentration but good eye contact.  AR 746.  Chatman reported that symptoms of PTSD were impacting Plaintiff's ability to be in public, although he reported more confidence in asserting his needs and that Abilify helped him be less agitated.  *Id.*  On March 16 Chatman described him as appearing "very depressed" and that he reported being "slow" from his

United States District Court
Northern District of California

1   medications.  AR 811.

2       In response to a request from Plaintiff's attorney, Chatman wrote a letter on March 23,

3   2016 stating that Plaintiff regularly reported disturbing nightmares, auditory hallucinations

4   causing heightened stress, and occasional physical symptoms of stress such as GI concerns.  AR

5   801.  He explained that Plaintiff's symptoms were consistent with PTSD such as increased startle

6   response, nightmares, flashbacks, tendency to isolate, hypervigilance, and disrupted sleep and

7   appetite, particularly occurring in public places.  *Id.*  He also described the paranoid ideation

8   expressed by Plaintiff, his often-depressed presentation, and his need to isolate more often to

9   decrease negative responses to triggers such as stressful situations.  *Id.*  Dr. Ganpule also signed

10   the letter.  *Id.*

11       At visits on March 30 and April 20, 2016, Dr. Ganpule noted that Plaintiff presented with

12   more active symptoms and an escalation in agitation from stress.  AR 804, 808.  His attention,

13   concentration, memory and attention were all good, and he denied active hallucinations or

14   paranoia, but he was generally distrustful.  AR 804.  Plaintiff stated he was trying to follow

15   through on stress reduction practices.  AR 806.

16       In July 2016 Plaintiff reported feelings of sadness and a belief that his medications were

17   not working and were causing him to feel "slow."  AR 870-71.  On July 20 he was tearful and

18   presented as depressed.  AR 866.

19       On July 20, 2016, Plaintiff told Dr. Ganpule he was having a "reactivation" of

20   anxiety/agitation and increase of hallucinations and symptoms.  AR 867.  At a visit with Dr.

21   Ganpule on August 3, Plaintiff reported doing much better than the prior month.  AR 863.  He still

22   presented as depressed when meeting with his therapist that same day.  AR 865.

23       On September 6, 2016, Plaintiff informed Dr. Ganpule that he continued to have auditory

24   hallucinations and there was no change in his PTSD symptoms and coping mechanism of isolating

25   himself.  AR 861.

26       On September 26, 2016, Plaintiff presented as depressed with intermittent eye-contact and

27   low-volume speech at a visit with therapist Chatman.  AR 858.  In October and November, he

28   presented as depressed and complained of forgetfulness and slowed mental functioning.  AR 851-

1    54. On December 19 he presented as depressed and complained of auditory hallucinations and

2    being "slow" with energy "off and on" although he felt more relaxed and confident than

3    previously.  AR 847-48.  In January and February 2017, Plaintiff presented as depressed and noted

4    anxiety and auditory hallucinations when feeling angry or upset.  AR 842-43, 846.

5            In March 2017 he reported depression and increased feelings of paranoia, as well as

6    feelings of "slow" mental capacity because of his medications.  AR 838-39.  He reported that

7    therapy was helpful.  AR 839.  He was doing well on Abilify with only occasional hallucinations,

8    which he was now able to ignore, and avoiding situations at home that could lead to conflicts.  *Id.*

9    His mental status examination showed no impairments in concentration, memory, insight or

10   judgment.  AR 840.

11           In April 2017 Plaintiff stated he was experiencing increased feelings of depression.  AR

12   837.  On April 18 Chatman noted that Plaintiff appeared depressed and that he reported distressing

13   forgetfulness, as well as continued paranoia and recurring thoughts of past trauma.  AR 836.  He

14   reported taking the bus to see a friend in San Jose, but he felt paranoid in crowds.  *Id.*  Therapy

15   had helped him get things off his chest.  AR 837.  Dr. Ganpule described Plaintiff as doing well

16   overall, avoiding people to reduce conflicts, and that he was pleasant and well-groomed, with no

17   impairment noted in concentration, memory, judgement or insight.  AR 834.

18           On May 15, 2017, Plaintiff presented with a depressed mood and frustration.  AR 833.  He

19   reported volunteering at Ms. Brown's office.  *Id.*  On June 13 Chatman described Plaintiff as

20   depressed and noted that he reported occasional to daily auditory hallucinations.  AR 831-32.

21           From November 2016 to April 2017 Plaintiff reported to Dr. Ganpule that he was doing

22   well with his medications and "avoiding being around people," although he continued to have

23   auditory hallucinations, particularly on bad days.  AR 834, 840, 844, 849.  On June 28 Dr.

24   Ganpule described Plaintiff as "stable" on his medications, although continuing to experience "the

25   same problems" with hallucinations and paranoia about others.  AR 829.

26           On August 28, 2017, Plaintiff attended a psychological evaluation with Caroline Salvador-

27   Moses, Psy.D.  AR 812-19.  Ms. Brown accompanied him and filled out the paperwork for him.

28   AR 812.  Plaintiff reported getting help with some activities of daily living and mostly isolating

1    himself.  AR 813.  Dr. Salvador-Moses noted Plaintiff appeared guarded and paranoid but

2    cooperative during the evaluation.  *Id.*  He also appeared depressed and anxious and his thought

3    process was tangential and circumstantial but redirectable.  *Id.*  His speech was pressured and fast

4    but comprehensible, and he was found to be highly distracted by flashbacks and auditory

5    hallucinations.  *Id.*

6         Dr. Salvador-Moses found that Plaintiff had poor memory and recall per testing but

7    adequate insight and judgment.  AR 814.  Intelligence testing found scores in the extremely low

8    category, with a full-scale IQ of 55.  *Id.*  Testing results indicated a severely impaired ability to

9    learn and recall new auditory or visual information, as well as plan, set shift, or use mental

10   flexibility.  AR 814-15.  Dr. Salvador-Moses opined that Plaintiff presented with the symptoms of

11   PTSD as well as borderline intellectual functioning, that his symptoms cause distress and

12   "clinically significant impairment in various areas of functioning," and his prognosis was poor.

13   AR 815.  Dr. Salvador-Moses observed that Plaintiff "appeared paranoid, depressed, and anxious,

14   and psychomotor agitation was evident.  He was also noted to rock back and forth which may

15   likely be due to the side effect of his medications."  *Id.*

16        Dr. Salvador-Moses found Plaintiff to have a moderate limitation in his ability to

17   understand and carry out simple instructions and tasks and a severe impairment with anything

18   more complex.  *Id.*  She found severe impairment in his ability to attend to usual work situations

19   such as attendance and safety as well as in his ability to deal with changes in routine, as he would

20   become distracted by flashbacks, auditory hallucinations and paranoid thoughts.  AR 816.  She

21   found moderate impairment in concentration overall and a severe impairment in pace and

22   persistence because of a slow thought process, explaining "his low energy and motivation due to

23   depression along with distractibility cause severe impairment in persistence."  AR 816, 818.

24   Additionally, Dr. Salvador-Moses opined that he was "highly paranoid" and would have moderate

25   impairment in interacting with the public and a severe impairment in interacting appropriately

26   with supervisors and coworkers.  AR 816.  She also recommended he receive assistance in

27   managing his funds.  *Id.*  Dr. Salvador-Moses stated that he would have "tremendous difficulties

28   in responding appropriately to usual work situations."  AR 818.

United States District Court
Northern District of California

United States District Court
Northern District of California

At his visits with therapist Chatman in July, September, October, and November 2017, Plaintiff appeared depressed with continued symptoms of PTSD.  AR 822-28.

On January 10, 2018, Dr. Ganpule filled out a mental impairment questionnaire.  AR 881-84.  Dr. Ganpule noted that Plaintiff had flashbacks, severe distrust and fearfulness at baseline even with his medications, which control major dysfunction only.  AR 883.  Dr. Ganpule opined that his limitations were present at the initial consultation in December 2013 and that he would be unable to perform even simple routine tasks with no more than occasional interaction with the public and no production pace work.  *Id.*  Dr. Ganpule opined that Plaintiff's PTSD symptoms would render him incapable of meeting many competitive standards of employment such as the ability to maintain socially appropriate behavior, deal with work stress, be aware of normal hazards, and perform at a consistent pace without an unreasonable number and length of rest periods.  AR 881-83.  He also opined Plaintiff's symptoms were managed with medication, which helped in preventing major dysfunction.  AR 883.

From January to October 2017, Plaintiff met with a case worker, Peter Fields, through the County Behavioral Health services, who worked with him to ensure compliance with his mental health treatment plan.  AR 895-931.

### III.    SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On June 25, 2014, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability beginning on June 6, 2009.  AR 282-90.  On November 26, 2014, the agency denied Plaintiff's claim, finding he did not qualify for disability benefits.  AR 121.  Plaintiff subsequently filed a request for reconsideration, which was denied on April 27, 2015.  AR 171-76.  On June 1, 2015, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 180-82.

### A.    Initial Hearing

ALJ Brenton Rogozen conducted a hearing on March 23, 2016.  AR 82-110.  Plaintiff testified in person at the hearing and was represented by counsel, Cynthia Starkey.  The ALJ also heard testimony from Vocational Expert McCrory, and Mary Brown, a social worker.

#### 1.    Plaintiff's Testimony

Plaintiff testified that he has always lived with his mother.  AR 86.  She was an alcoholic

1    and abusive towards him until recently.  AR 93-94.  Plaintiff has a son that lived with them until

2    he was 18, and his mother was also abusive towards his son.  AR 94.  His sisters helped raise his

3    son.  *Id.*

4          Plaintiff attended special education classes in school and once worked as a clean up guy at

5    a restaurant for a few years in the 1990s.  AR 87-88, 92.  He last had a driver's license about

6    thirteen years prior.  AR 87.  He completed a recovery program and had been clean and sober for

7    six years.  AR 91-92.

8          Plaintiff experienced multiple instances of violence and was worried about being killed.

9    AR 96.  He feared running into people he used to know when he tried to go to vocational

10   rehabilitation services because he had done drugs with them.  AR 98.  His medication made him

11   feel "dopey" and "messed up."  AR 97.  He watched TV and lets the dog run in the front yard

12   during the day.  AR 99.

13         ### 2.    Mary Brown's Testimony

14         Mary Brown testified she had helped Plaintiff for approximately three to four years,

15   spending about seven or eight hours a week with him.  AR 101.  She stated Plaintiff "seems very

16   paranoid," with nervousness, twitching and fidgeting when outside his house.  AR 102-03.  She

17   testified that Plaintiff sometimes makes no sense when he talks, and she must repeat questions or

18   ask them in a different manner.  AR 102.  He shows both good and bad days.  *Id.*  On bad days, he

19   gets very nervous just riding in a car and fidgets with the window.  AR 102-03.  Sometimes she

20   must stop the car so he can get out.  AR 102-03.  *Id.*  He has moods where he refuses to get in the

21   car.  AR 104.  He was paranoid that someone was watching him when he arrived at the hearing

22   office that day and would not leave the area of the car without encouragement.  AR 104.  He

23   needed additional encouragement and assistance to get into the hearing office because he was

24   refusing to move.  *Id.*

25         Brown testified she did not believe his medication was fully working.  AR 103.  She asks

26   him if he is taking his medication and sometimes he says yes, sometimes he says no, or that he

27   doesn't know.  *Id.*  She stated he needs someone to go to the doctor with him to help understand

28   what they are saying.  *Id.*  Sometimes he does not understand what he is told even when it is

United States District Court
Northern District of California

1    repeated.  *Id.*

2         Brown testified that she thought Plaintiff was making progress, but it could take a while

3    and he needed more counseling.  AR 104-05.

4         **3.       Vocational Expert's Testimony**

5         The ALJ asked the vocational expert a series of hypotheticals.  In the first, he asked her to

6    assume an individual who doesn't have any problem following or remembering simple

7    instructions, but complex and detailed instructions are out; and would require a low-stress job with

8    minimal contact with the public.  AR 106.  When asked if the hypothetical person could perform

9    any jobs customarily in the national economy, the expert testified that such an individual could

10   work under the Dictionary of Occupational Titles ("DOT")[2] as an egg washer (DOT 529.686-030,

11   Specific Vocational Preparation ("SVP")[3] level 1); agricultural sorting and grading (DOT

12   529.687-186, SVP 2); production assembly (DOT 706.684-010, SVP 2); and dishwasher (DOT

13   318.687-010, SVP 2).  AR 106-07.

14        In the second hypothetical, the ALJ asked if the same individual would be able to perform

15   these four jobs if he had a marked impairment in the ability to maintain attention and

16   concentration and would be off task 20% of the time.  AR 107.  The expert replied that those

17   limitations would make an individual unemployable.  AR 107-09.

18        **4.       ALJ's Decision and Plaintiff's Request for Review**

19        On April 26, 2016, ALJ Rogozen issued a partially favorable decision finding Plaintiff

20   qualified for benefits as of February 26, 2016.  AR 136-41.  In this first hearing decision, ALJ

21   Rogozen found that Plaintiff's mental conditions of borderline intellectual functioning and PTSD

22

23   [2] The Dictionary of Occupational Titles by the United States Department of Labor, Employment &
     Training Administration, may be relied upon "in evaluating whether the claimant is able to
24   perform work in the national economy."  *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).
     The DOT classifies jobs by their exertional and skill requirements and may be a primary source of
25   information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d) (1).  The "best source for how
     a job is generally performed is usually the Dictionary of Occupational Titles."  *Pinto v.
26   Massanari*, 249 F.3d 840, 846 (9th Cir. 2001).

27   [3] "The Dictionary of Occupational Titles lists an SVP time for each described occupation.  Using
     the skill level definitions in 20 C.F.R §§ 404.1568 and 416.968, unskilled work corresponds to an
28   SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an
     SVP of 5-9 in the DOT."  Social Security Ruling 00-4p.

United States District Court
Northern District of California

were severe, that prior to February 27, 2016 his conditions caused only mild to moderate limitations, and that he could perform work with no complex or detailed instructions in a low stress environment with less than occasional contact with the public.  AR 143-46.  He found that after February 27, 2016, Plaintiff's condition met the listing for an intellectual disorder at section 12.05 of 20 C.F.R. Part 404, Subpart P, Appendix 1.[4]  AR 152.

Plaintiff requested review of the unfavorable portion of his hearing decision by the Appeals Council, and the case was remanded for additional proceedings.  AR 161-64.

**B.      Hearing on Remand**

ALJ Rogozen conducted a second hearing on January 31, 2018.  AR 40-81.  Plaintiff testified in person and was again represented by Cynthia Starkey.  The ALJ also heard testimony from Medical Expert William Straw, M.D.,[5] Vocational Expert Susan Miranda, and Mary Brown.

**1.      Medical Expert's Testimony**

Dr. Straw stated that he had not reviewed documents in the record from the San Mateo Behavioral Health and Recovery Services, dated January to October 2017.  AR 43-44.  He noted that Plaintiff reported developing depression three months prior due to his son's incarceration and PTSD stemming from childhood physical and emotional abuse.  AR 49.  He testified that Plaintiff's substance abuse did not appear to be a current issue.  *Id.*

Dr. Straw testified that Plaintiff's PTSD manifests as "a tendency to isolate, hyper-responsiveness for small things to become big things."  AR 50.  His borderline intellectual functioning puts significant limitations on his functionality along with the depression and PTSD. *Id.*  However, his borderline intellectual functioning did not meet or equal Listing 12.05 criteria due to the adequacy of adaptive functioning.  *Id.*  He would be unable to perform more than simple, routine, repetitive tasks, could spend no more than 50% of his time with the public and coworkers, should not be required to do performance type work that has a number of items needing to be completed in a period of time, and could not depend upon others for his work duties.

---

[4] As discussed below, the listings describe impairments that are considered "to be severe enough to prevent an individual from doing any gainful activity."  20 C.F.R. § 404.1525(a).
[5] Both the record and the parties refer to "Dr. Straw" and "Dr. Strahl," but it appears they may be the same person.  The Court addresses this in its discussion of the medical opinions below.

United States District Court
Northern District of California

AR 50-51.  He could probably do maintenance type work where he would be able to do the task independently for as long as it took him.  AR 51.

Dr. Straw testified that Plaintiff's level of PTSD and depression had stayed the same since his application date of June 2014.  AR 52.  His adaptive functioning was high enough that he did not meet Listing 12.04 or 12.05.  *Id.*  His limitations in the B criteria of the Listing of Impairments[6] were mostly moderate.  AR 52-53.  He did not qualify for the C criteria because he is able to care for his own needs at a very baseline level.  *Id.*  He opined that Plaintiff would have only moderate limitations in persistence and pace because he would only be doing simple, routine, and repetitive tasks.  AR 55.  If any evaluators qualified Plaintiff as having a "low adaptive functioning" for basic needs, he would not have disagreed with their opinion.  AR 57.

### 2.    Plaintiff's Testimony

Plaintiff testified he keeps to himself and cannot be around more than one or two other people.  AR 60.  He hears voices and sees things and hates having stuff behind him.  *Id.*  His medication helps a little.  *Id.*

Plaintiff takes the bus to Ms. Brown's office, where he spends time as a volunteer shredding paper.  AR 61.  He can take the bus once or twice a month but must sit in the back.  AR 61-62.  Ms. Brown helped him get his driver's license and provided him with a clunky truck.  AR 62.  He can go to the doctor's office by taking one bus or biking.  *Id.*  Most of the time Ms. Brown shops for him even if there are very few people at the store because he cannot stand to have anyone behind him.  AR 63.  Having to clean a certain number of rooms would cause him too much stress and he did not think he could do it.  AR 64.  He testified that eight hours is a long time, and he had not worked in a long time, so he did not think he could work.  *Id.*

---

[6] In making the disability determination, the ALJ must perform the psychiatric review technique set forth in 20 C.F.R. § 416.920a, which requires an ALJ to rate a claimant's degree of functional limitation (none, mild, moderate, marked, or extreme) in activities of daily living, social functioning, and concentration, persistence, or pace, and to determine whether the claimant has had repeated episodes of decompensation.  20 C.F.R. § 416.920a(c).  These four areas are collectively called the "paragraph B" criteria.  20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 12.00C (in assessing severity, "[w]e assess functional limitations using the four criteria in paragraph B of the listings").

United States District Court
Northern District of California

United States District Court
Northern District of California

### 3. Mary Brown's Testimony

Ms. Brown testified she is the field office director at an independent living services organization.  AR 67.  She helps Plaintiff with daily living skills.  *Id.*  She must keep reminding him how to do things and repeat instructions multiple times.  AR 68.  He forgets how to use his debit card.  *Id.*  He goes into the bank to ask the teller for cash instead of using an ATM because he cannot use it.  AR 68-69.  She opined that Plaintiff is too dependent on help to be capable of shopping by himself.  AR 70.

It took a year to a year and a half for Plaintiff to learn how to get his driver's license and he was only able to take the exam with someone reading him the test and showing him the signs.  AR 71.  The doctor's office he drives to is just straight down the street.  AR 70.

Although Plaintiff shreds papers at her office, he is unable to shred a full box because he becomes too distracted and paranoid and cannot focus.  AR 72.  There are a lot of people around the office and he becomes distracted and does not concentrate.  *Id.*  He asks for a lot of reassurance and cannot manage to deal with the stress of papers being jammed in the shredder.  *Id.*

Plaintiff has gotten lost a couple of times trying to take the bus and she had to go and find him.  *Id.*  He gets agitated, cannot remember instructions, needs things repeated up to twenty times, and his processing skills are slow.  AR 73.

### 4. Vocational Expert's Testimony

In response to hypotheticals posed by the ALJ, the vocational expert testified that an individual limited to simple, repetitive tasks, with no problem interacting with supervisors, who can act "normally" and can spend 50% of the day with coworkers, and one third of the day with the public, no production pace jobs and no group work could work as a dishwasher (DOT 318.87-010), a motel/hotel housekeeper (DOT 323.687-014), or a landscape helper (DOT 406.67-010).  AR 76-77.  There is no employment for a worker with unpredictable or erratic behavior, and no more than one absence a month is tolerable by most employers.  AR 78-79.

### C. ALJ's Final Decision and Plaintiff's Request for Review

ALJ Rogozen issued a second partially favorable decision on June 22, 2018, this time finding that Plaintiff did not become disabled until August 28, 2017.  AR 16-33.  This decision

became final when the Appeals Council declined to review it on June 17, 2019.  AR 1.

Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  On May 1, 2020, Plaintiff filed the present Motion for Summary Judgment.  On May 29, 2020, Defendant filed a Cross-Motion for Summary Judgment.

## IV.   STANDARD OF REVIEW

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  An ALJ's decision to deny benefits must be set aside only when it is "based on legal error or not supported by substantial evidence in the record." *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation and quotation marks omitted).  It requires "more than a mere scintilla" but "less than a preponderance" of the evidence. *Id.*; *Trevizo*, 871 F.3d at 674.

The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Trevizo*, 871 F.3d at 675 (citation and quotation marks omitted).  However, "[w]here evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Id.* (citation and quotation marks omitted).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citation and quotation marks omitted).

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012).  "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id.* (citation and quotation marks omitted).  A court may not reverse an ALJ's decision because of a harmless error. *Id.* at 1111 (citation omitted).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Id.* (citation and quotation marks omitted).

United States District Court
Northern District of California

## V.   DISCUSSION

### A.   Framework for Determining Whether a Claimant Is Disabled

A claimant is considered "disabled" under the Social Security Act if two requirements are met.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be severe enough that the claimant is unable to perform previous work and cannot, based on age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.  20 C.F.R. § 404.1520.  The claimant bears the burden of proof at steps one through four.  *Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020) (citation omitted).

At step one, the ALJ must determine if the claimant is presently engaged in a "substantial gainful activity," 20 C.F.R. § 404.1520(a)(4)(i), defined as "work done for pay or profit that involves significant mental or physical activities."  *Ford*, 950 F.3d at 1148 (internal quotations and citation omitted).  Here, the ALJ determined Plaintiff had not performed substantial gainful activity since the alleged onset date, June 6, 2009.  AR 20.

At step two, the ALJ decides whether the claimant's impairment or combination of impairments is "severe," 20 C.F.R. § 404.1520(a)(4)(ii), "meaning that it significantly limits the claimant's 'physical or mental ability to do basic work activities.'"  *Ford*, 950 F.3d at 1148 (quoting 20 C.F.R. § 404.1522(a)).  If no severe impairment is found, the claimant is not disabled.  20 C.F.R. § 404.1520(c).  Here, the ALJ determined Plaintiff had the following severe impairments: depression, PTSD, and borderline intellectual functioning.  AR 20.

At step three, the ALJ evaluates whether the claimant has an impairment or combination of impairments that meets or equals an impairment in the "Listing of Impairments" (referred to as the

"listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1.  The listings describe impairments that are considered "to be severe enough to prevent an individual from doing any gainful activity."  20 C.F.R. § 404.1525(a).  Each impairment is described in terms of "the objective medical and other findings needed to satisfy the criteria of that listing."  *Id.* § 404.1525(c)(3).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (footnote omitted).  If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is conclusively presumed to be disabled, without considering age, education and work experience.  20 C.F.R. § 404.1520(d).  Here, the ALJ determined that, prior to August 28, 2017, Plaintiff did not have an impairment or combination of impairments that meets the listings.  AR 21.

If the claimant does not meet or equal a listing, the ALJ proceeds to step four and assesses the claimant's residual functional capacity ("RFC"), defined as the most the claimant can still do despite their imitations (20 C.F.R. § 404.1545(a)(1)), and determines whether they are able to perform past relevant work, defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [claimant] to learn to do it."  20 C.F.R. § 404.1560(b)(1).  If the ALJ determines, based on the RFC, that the claimant can perform past relevant work, the claimant is not disabled.  *Id.* § 404.1520(f).  Here, the ALJ determined that, prior to August 28, 2017, Plaintiff had the RFC to

> perform a full range of work at all exertional levels but with the following nonexertional limitations: he can perform simple, repetitive tasks.  The claimant can have occasional contact with the public and spend up to 50 percent of day around co-workers.  He can work in a room with co-workers present, but his work must be independent.  He is precluded from group work.  The claimant has no problems interacting with supervisors.  He is precluded from production jobs where he is required to produce a certain number of widgets per hours.

AR 24.  However, the ALJ determined Plaintiff has no past relevant work.  AR 30.

At step five, the burden shifts to the agency to prove that "'the claimant can perform a significant number of other jobs in the national economy.'"  *Ford*, 950 F.3d at 1149 (quoting

United States District Court
Northern District of California

*Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002)).  To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines found at 20 C.F.R. Pt. 404 Subpt. P, App. 2,[7] or on the testimony of a vocational expert.  *Ford*, 950 F.3d at 1149 (citation omitted).  "[A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy."  20 C.F.R. § 404.1560(b)(2).  An ALJ may also use "other resources," such as the DOT.  *Id.*  Here, the ALJ determined that prior to August 28, 2017, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed, including dishwasher, landscape helper, and motel/hotel housekeeper.  AR 30-31.

The ALJ concluded that, beginning August 28, 2017, the severity of Plaintiff's impairments met the criteria of section 12.04 of the Listing of Impairments.  AR 31.  As such, he became disabled on that date.  AR 32.

**B.    Plaintiff's Arguments**

Plaintiff raises three arguments: (1) the ALJ erred in his evaluation of the medical opinions regarding his symptoms prior to August 2017; (2) the ALJ failed to provide a germane reason for discrediting Mary Brown's third party statements; and (3) the ALJ erred in evaluating his own statements about his impairments.

**C.    Medical Opinions**

In his decision, the ALJ determined that Plaintiff did not have an impairment that met one of the Listings prior to August 28, 2017, the date Dr. Salvador-Moses completed her psychological evaluation.  AR 21, 812-19.  Plaintiff argues the ALJ committed error because he provided little to

---

[7] The Medical-Vocational Guidelines "relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy."  *Heckler v. Campbell*, 461 U.S. 458, 461 (1983).  The Guidelines "consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy."  *Id.* at 461-62 (footnotes omitted).  The guidelines are commonly known as "the grids".  *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).

United States District Court
Northern District of California

1  no rational explanation for his assignment of August 28, 2017 as the onset date for his disability.

2  Pl.'s Mot. at 3.  Specifically, while the ALJ gave great weight to Dr. Straw's opinion from 2018

3  (AR 28), Plaintiff argues this was based in part "on erroneous facts and without any analysis of the

4  actual quality of the doctor's opinion."  *Id.*  The ALJ also gave great weight to two examining

5  sources – Drs. Chaffee and Salvador-Moses (AR 28, 32) – but Plaintiff argues he failed to explain

6  why those opinions did not support a finding of disability as of the application date.  *Id.*  Finally,

7  Plaintiff argues the ALJ failed to utilize the appropriate criteria to review the opinions of the

8  treating psychiatrist.  *Id.*

9      **1.    Legal Standard[8]**

10      When determining whether a claimant is disabled, the ALJ must consider each medical

11  opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b);

12  *Algazzali v. Colvin*, 2016 WL 394009, at *6 (N.D. Cal. Feb. 1, 2016).  In deciding how much

13  weight to give to any medical opinion, the ALJ considers the extent to which the medical source

14  presents relevant evidence to support the opinion.  20 C.F.R. § 416.927(c)(3).  Generally, more

15  weight will be given to an opinion that is supported by medical signs and laboratory findings, and

16  the degree to which the opinion provides supporting explanations and is consistent with the record

17  as a whole.  20 C.F.R. § 416.927(c)(3)-(4).

18      In conjunction with the relevant regulations, the Ninth Circuit "developed standards that

19  guide [the] analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*,

20  528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  Courts "distinguish among the

21  opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2)

22  those who examine but do not treat the claimant (examining physicians); and (3) those who neither

23  examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830

24  (9th Cir. 1995).

25

26  _____

27  [8] Rules regarding the evaluation of medical opinion evidence were recently updated, but the
    updates were made effective only for claims filed on or after March 27, 2017.  *See* 82 Fed. Reg.
    5844 (Jan. 18, 2017).  As Plaintiff's claim was filed before 2017, the Court evaluates the medical

28  opinion evidence in his case under the older framework as set forth in 20 C.F.R. §§
    404.1527(c)(2), 416.927(c)(2) and in Social Security Ruling 96-2p.

If a claimant has a treatment relationship with a provider, and clinical evidence supports that provider's opinion and is consistent with the record, the provider will be given controlling weight.  20 C.F.R. § 416.927(c)(2).  "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'"  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).  "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [SSA] considers specified factors in determining the weight it will be given."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician."  *Id.* (citing 20 C.F.R. § 404.1527(c)(2)(i)-(ii)).

> Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record.

*Id.* (citing 20 C.F.R. § 404.1527(c)(3)-(6)).  Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference.  *See Orn*, 495 F.3d at 632 (citing SSR 96–2p,[9] 1996 WL 374188 (July 2, 1996)).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  SSR 96-2p at 4.

Where an examining doctor's opinion is contradicted by another opinion, an ALJ may reject it by providing specific and legitimate reasons that are supported by substantial evidence.

---

[9] "[Social Security Rulings] do not carry the force of law, but they are binding on ALJs nonetheless."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see* 20 C.F.R. § 402.35(b)(1).  The Ninth Circuit defers to the rulings unless they are "plainly erroneous or inconsistent with the Act or regulations."  *Chavez v. Dep't. of Health & Human Serv.*, 103 F.3d 849, 851 (9th Cir. 1996).

1   *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

2        **2.**     **Analysis**

3             **a.**     **Dr. Straw**

4        The Court finds remand appropriate.  As a preliminary matter, the ALJ states in his opinion

5   that Nathan R. Strahl, M.D., Ph.D., testified via telephone as an impartial medical expert.  AR 27.

6   However, the transcript for the January 31, 2018 hearing lists Dr. William Straw as the testifying

7   medical expert, and the ALJ refers to "Dr. Straw" throughout the hearing.  AR 40, 42, 44.  This

8   could be harmless error, but clarification is appropriate.

9        Turning to the ALJ's decision, the Court finds clarification is also needed regarding the

10   weight given to Dr. Straw's opinion.  In his decision, the ALJ first states he gave it "great weight."

11   AR 28.  He noted that Dr. Straw is a psychology and neurology specialist, has an awareness of all

12   the medical evidence in the record, was present at the hearing to hear Plaintiff's testimony, and

13   understands Social Security disability programs and requirements.  *Id.*  He found Dr. Straw's

14   opinion is "reasonable and consistent with the objective medical evidence.  His opinion is

15   supported by the treatment record showing generally normal mental status examination findings

16   with medication compliance" and that it "is consistent with the claimant's reported activities of

17   daily living including ability to manage finances."  *Id.*

18        However, the ALJ later states he gave "little weight" to Dr. Straw's opinion, finding it was

19   inconsistent with a finding that the severity of Plaintiff's impairments meets Listing 12.04.  AR

20   32.  The ALJ noted Dr. Straw's opinion was

21             inconsistent with evidence since the established onset date described
above that documents a history of the depressive disorder over a

22             period of at least 2 years, with evidence of both medical treatment,
mental health therapy, and psychosocial supports that is ongoing and

23             that diminishes the symptoms and signs of the mental disorder, <u>and</u>
the claimant has achieved only marginal adjustment, involving a

24             minimal capacity to adapt to changes in their environment or to
demands not already part of the claimant's daily life.  Accordingly,

25             little weight is given to this opinion.

26   *Id.*

27        Defendant argues "[i]t is apparent that the ALJ gave great weight to Dr. Strahl's opinion,

28   prior to the CE's August 2017 report, and after the report, given the evidence supporting low

United States District Court
Northern District of California

adaptive functioning."  Def.'s Mot. at 3.  While this may be true, it is not clear from the decision, and the Court declines to intuit what the ALJ may have been thinking.  *See Bray v. Comm'r of Social Security Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual finding offered by the ALJ – not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking.").  As written, the decision indicates the opinion is both simultaneously worthy of great weight, and of little weight, which is confusing at best.  The ALJ must consider each medical opinion in the record together with the rest of the relevant evidence and determine how much weight to give to any medical opinion. 20 C.F.R. § 416.927(b), (c)(3). Accordingly, the Court finds remand appropriate for the ALJ to clarify the weight given to Dr. Straw's opinion.

### 3.  Dr. Chaffee, Dr. Ganpule, and Dr. Salvador-Moses

Plaintiff also raises arguments relating to the weight given Dr. Chaffee's, Dr. Ganpule's, and Dr. Salvador-Moses' opinions.  Pl.'s Mot. at 6-9.  However, given the need for clarification regarding the weight given to Dr. Straw's opinion, the Court finds any revised decision could impact consideration of these doctors' opinions as well.  Accordingly, on remand, the ALJ shall consider whether the weight given to the other medical opinions of record also requires reconsideration.

### D.  Third Party Statements

In his decision, the ALJ considered Ms. Brown's testimony, including the nature and extent of her relationship with Plaintiff and whether it was consistent with other evidence, but found it could not be given significant weight because "Ms. Brown is not medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or of the frequency of intensity of unusual moods or mannerisms . . .."  AR 19.  The ALJ also noted her testimony was not "consistent with the preponderance of the opinions and observations by medical doctors in this case prior to August 28, 2017."  *Id.*  Plaintiff argues Ms. Brown's testimony cannot be dismissed solely on the basis that she was not a medical professional, and there is no evidence that her position as a field worker did not adequately

28

1  prepare her to provide honest testimony regarding her interactions with him.  Pl.'s Mot. at 10.  He

2  further argues her statements about her own observations do not contradict the opinions and

3  observations by the medical professionals as Ms. Brown was not describing Plaintiff's behavior

4  during one-on-one meetings with doctors; rather, her statements consisted of observations of his

5  ability to perform tasks without her assistance, as well as his behavior while outside his home and

6  in the community.  *Id.*

7        "In determining whether a claimant is disabled, an ALJ must consider lay witness

8  testimony concerning a claimant's ability to work."  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d

9  1050, 1053 (9th Cir. 2006) (citation omitted).  An ALJ may discount lay testimony only by

10  providing "reasons that are germane to each witness."  *Greger v. Barnhart*, 464 F.3d 968, 972 (9th

11  Cir. 2006) (quoting *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)).

12        While it is true that inconsistency with the medical evidence of record could constitute a

13  germane reason to discount lay witness testimony – *see e.g., id.*; *Bayliss*, 427 F.3d at 1218; *Lewis*

14  *v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) – it is also true that an ALJ may not simply "discredit

15  [the] lay testimony as not supported by medical evidence in the record."  *Bruce v. Astrue*, 557 F.3d

16  1113, 1116 (9th Cir. 2009).  Such testimony is valuable precisely because it provides additional

17  information that is not necessarily reflected in the medical records, including how an individual is

18  able to function in the community and with what level of support.  *See Schneider v. Comm'r of*

19  *Soc. Sec. Admin.*, 223 F.3d 968, 975-76 (9th Cir. 2000) (ALJ improperly excluded letters from

20  friends and ex-employers which established that claimant was unable to perform the

21  responsibilities of her job without her supervisors or co-workers continually telling her what to

22  do.).

23        Here, the ALJ did not identify any specific inconsistencies, and only offered his conclusion

24  that Ms. Brown's testimony "is simply not consistent with the preponderance of the opinions and

25  observations by medical doctors in this case prior to August 28, 2017."  AR at 29.  The ALJ did

26  not identify which portions of Ms. Brown's testimony were rejected or adopted and, without such

27  information, the Court is unable to find substantial evidence supporting the rejection of those

28  statements.  *See Bayliss*, 427 F.3d at 1211 (inconsistency with the medical record constitute a

1   germane reason to reject the lay witness testimony where "rejection of certain testimony was

2   supported by substantial evidence"); *Dias v. Berryhill*, 2019 WL 4674376, at *10 (N.D. Cal. Sept.

3   25, 2019) (finding the ALJ improperly rejected lay witness's testimony by conclusively stating

4   "the medical record did not support the level of dysfunction described" without identifying which

5   portions of the statement were rejected or adopted).

6           Further, the ALJ's decision to reject Ms. Brown's testimony on the basis that she is not

7   medically trained is suspect given that as a lay witness she may base her testimony on her

8   observations rather than medical expertise. *See Bruce*, 557 F.3d at 1116; *Huerta v. Berryhill*,

9   2019 WL 109444, at *12 (N.D. Cal. Jan. 4, 2019) (The ALJ's reliance on Mr. Huerta's failure to

10  use accepted medical standards is suspect given that as a lay witness Mr. Huerta may base his

11  testimony on his observations, rather than medical expertise).

12          Accordingly, the Court finds remand appropriate for the ALJ to clarify the germane

13  reasons he rejected Ms. Brown's testimony.

14  **E.     Subjective Complaints**

15          The ALJ determined that, prior to August 28, 2017, Plaintiff's statements were

16  "inconsistent" with evidence that "despite intermittent periods of worsening symptoms,

17  medication and therapy treatment generally helped his symptoms improve."  AR 25.  Plaintiff

18  argues the ALJ erred because he cannot disregard a claimant's symptoms based solely on the

19  medical evidence.  Pl.'s Mot. at 13.  He maintains the ALJ failed to demonstrate any direct

20  contradiction between the records and his statements that would allow for them to be discredited.

21  *Id.*

22          Congress expressly prohibits granting disability benefits based solely on a claimant's

23  subjective complaints.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or

24  other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 416.929(a) (an

25  ALJ will consider all of a claimant's statements about symptoms, including pain, but statements

26  about pain or other symptoms "will not alone establish" the claimant's disability).  However, an

27  ALJ is required to make specific credibility findings.  *See* SSR 96-7p, 1996 WL 374186, at *2

28  (July 2, 1996) (the credibility finding "must be sufficiently specific to make clear to the individual

and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight").  "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

Here, the Court is unable to determine whether the ALJ properly rejected Plaintiff's subjective complaints because his reasoning is based in large part on the medical opinion evidence and, as discussed above, the ALJ's consideration of that evidence requires clarification.  Accordingly, on remand the ALJ shall also consider whether his rejection of Plaintiff's subjective complaints requires reconsideration.

### F.    Remedy

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits."  *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)).  However, under the credit-as-true rule, the Court may order an immediate award of benefits if three conditions are met.  First, the Court asks, "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"  *Id.* (quoting *Garrison*, 759 F.3d at 1020).  Second, the Court must "determine whether there are outstanding issues that must be resolved before a disability determination can be made, . . . and whether further administrative proceedings would be useful."  *Id.* (citations and internal quotation marks omitted).  Third, the Court then "credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability."  *Id.* (citing *Treichler*, 775 F.3d at 1101).

It is only "rare circumstances that result in a direct award of benefits" and "only when the record clearly contradicted an ALJ's conclusory findings and no substantial evidence within the record supported the reasons provided by the ALJ for denial of benefits."  *Id.* at 1047.  Further, even when all three criteria are met, whether to make a direct award of benefits or remand for further proceedings is within the district court's discretion.  *Id.* at 1045(citing *Treichler*, 775 F.3d at 1101).  While all three credit-as-true factors may be met, the record as a whole could still leave

doubts as to whether the claimant is actually disabled.  *Trevizo*, 871 F.3d at 683 n.11.  In such instances, remand for further development of the record is warranted.  *Id.*

Here, the ALJ failed to fully and fairly develop the record when evaluating Plaintiff's disability claim, but it is not clear that the ALJ would be required to find Plaintiff disabled. Accordingly, remand for further proceedings is appropriate.

## VI.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiff's motion, **DENIES** Defendant's cross-motion, and **REVERSES** the ALJ's decision.  This case is **REMANDED** for further administrative proceedings consistent with this order.  The Court shall enter a separate judgment, after which the Clerk of Court shall terminate the case.

**IT IS SO ORDERED.**


Dated: September 28, 2020

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California